IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Tammy L. Holley,                 ) | Civil Action No. 6:16-2845-BHH-KFM |
|                   ) | |
|        Plaintiff,      ) | |
|                   ) | **REPORT OF MAGISTRATE JUDGE** |
|       v.           ) | |
|                   ) | |
| Nancy A. Berryhill, Acting    ) | |
| Commissioner of Social Security,   ) | |
|                   ) | |
|       Defendant.    ) | |
| _____) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on July 2, 2010, alleging she became unable to work on November 1, 2006. The applications were denied initially and upon reconsideration by the Social Security Administration.  On June 14, 2011, the plaintiff

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, Ph.D., an impartial vocational expert, appeared on July 24, 2012, via video, considered the case *de novo*, and on August 17, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on August 7, 2013.

The plaintiff sought judicial review of the ALJ's decision, and on January 9, 2015, the United States District Court for the District of South Carolina remanded the case to the Commissioner for further administrative review in *Holley v. Comm'r of Soc. Sec. Admin.*, C.A. No. 6:13-2704-BHH.  On February 13, 2015, the Appeals Council issued an order remanding the case to the ALJ for proceedings consistent with the court's order.  On June 23, 2015, a second video hearing was held, and on August 20, 2015, the ALJ issued a decision finding the plaintiff was not disabled (Tr. 592-605).  Prior to the hearing, the plaintiff amended her alleged onset date to September 14, 2009.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council declined to assume jurisdiction on June 15, 2016 (Tr. 579-85). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

(2)     The claimant has not engaged in substantial gainful activity since September 14, 2009, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: obesity; rheumatoid arthritis; fibromyalgia; status post right wrist carpal tunnel surgery; and hearing loss (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  Specifically, the claimant can lift and carry up to 20 pounds occasionally and ten pounds frequently and stand, walk, and sit for six hours each in an eight-hour work day; however, the claimant can never climb, crawl, kneel, or tolerate exposure to loud noise.  She must have a sit/stand option at will.  She can occasionally finger bilaterally and frequently handle bilaterally.  The claimant can perform occasional overhead reaching bilaterally.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on July 23, 1964, and was 45 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563 and 416.963).

(8)    The claimant has a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the

claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from September 14, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(A), (H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

4

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 45 years old on her amended alleged disability onset date (September 14, 2009) and was 51 years old on the date of the ALJ's decision (August 20,

2015).  She has a high school education and past relevant work as a medical records assistant and a pharmacy technician (Tr. 618).

The plaintiff's medical history at the Carolina Spine Institute includes a 1978 left tympanoplasty (eardrum repair surgery), 1994 cervical discectomy and fusion, and a 1998 carpal tunnel release (Tr. 270, 285, 293).  On January 20, 2003, the plaintiff returned with neck pain.  A left cervical epidural steroid injection was administered, which improved her pain, but her grip strength was diminished (Tr. 288-92).

On September 19, 2005, at Georgetown Memorial Hospital, the plaintiff reported a several month history of hearing loss.  Terry L. Fry, M.D., diagnosed her with bilateral middle ear effusion with conductive hearing loss and planned to insert bilateral myringotomies with tubes (Tr. 293).

On May 16, 2006, the plaintiff saw Lance A. Duvall, M.D., of Georgetown Health Group.  She reported right hand and wrist pain.  She was wearing a wrist band and taking Aleve, but she stated the wrist band made the pain worse.  She had decreased hand strength (Tr. 335).

On September 26, 2006, Jonathan Mitchell Twining, M.D., a rheumatologist at Carolina Rheumatology and Neurology, wrote that a bone scan done on July 17, 2006, showed increased activity of both wrists and increased activity in all joints of both hands. The plaintiff described pain in both hands since March 2006.  Both of her hands demonstrated synovitis over the metacarpophalangeal joints ("MCPs"), and the plaintiff had decreased grip strength.  Based on the bone scan and synovitis, a prednisone taper was

started. Dr. Twining was strongly suspicious of rheumatoid arthritis (Tr. 299-301). On October 10, 2006, x-rays showed mild bilateral degenerative arthritis of the plaintiff's fingers (Tr. 303). On October 13, 2006, Dr. Twining stated that the plaintiff's history, presentation, and bone scan were compatible with seronegative rheumatoid arthritis. She was prescribed Methotrexate (Tr. 307). On November 3, 2006, the plaintiff's hands demonstrated synovitis over the MCPs, and she had decreased grip strength (Tr. 309).

On September 27, 2006, the plaintiff reported fatigue and ear pain. She had an apparent recurrent otitis (Tr. 337).

On February 7, 2007, the plaintiff continued to be treated with prednisone and Methotrexate. Her erythrocyte sedimentation ("SED") rate was high at 40 (Tr. 318-19). On May 9, 2007, Dr. Twining diagnosed the plaintiff with osteoarthritis in addition to rheumatoid arthritis. She had pain in her right thumb. Ultram was prescribed (Tr. 323).

On September 11, 2007, the plaintiff was seen for hypertension, gastroesophageal reflux disease ("GERD"), and possible rheumatoid arthritis. She was seeing Dr. Twining and was on folate, Methotrexate, Lozol, and Nexium (Tr. 342). On October 26, 2007, the plaintiff reported left ear pain. She had previous infections and had pretty much lost all of her hearing in the ear from infections. She also has a history of bruxism and possible temporomandibular joint ("TMJ") syndrome (Tr. 349).

On April 18, 2008, x-rays revealed bilateral degenerative osteoarthritis (Tr. 332). On May 27, 2008, the plaintiff reported pain in her left leg from her knee down to her

foot. She also had bilateral hand and wrist pain. She received a corticosteroid injection in her left knee (Tr. 515-17).

On June 23, 2008, Dr. Twining wrote that the plaintiff was disabled due to her condition. She had rheumatoid arthritis diagnosed by a positive bone scan done on July 16, 2006. The condition caused her widespread pain and stiffness. She was on Methotrexate for her condition. She would not be able to tolerate prolonged standing or walking, grasping, pulling, stooping, bending, heavy lifting, kneeling, or squatting (Tr. 333).

On July 15, 2008, the plaintiff had problems with recurrent otitis media, with some decreased hearing. It was noted that she had a speech impediment (Tr. 352).

On August 25, 2008, Dr. Twining examined the plaintiff, who had pain in both hands. Dr. Twining reported that the plaintiff's fingers appeared normal; she had no synovitis in her hands bilaterally; her grip strength was normal; her cervical range of motion was normal, with full flexion/extension and rotation; she had no back abnormalities; her hip range of motion was normal; her knee range of motion was normal; her ankle was normal; her muscle strength was 5/5 in all groups tested; her muscle tone was normal; her deep tendon reflexes were normal; and she had no neurological deficits. She received an injection in her right thumb (Tr. 520-21, 602). Dr. Twining diagnosed esophageal reflux, essential hypertension, and rheumatoid arthritis (Tr. 521). The plaintiff received another injection in her thumb on November 21, 2008 (Tr. 525).

On February 17, 2009, the plaintiff had leg pain, which was possibly related to her lumbar spine (Tr. 528).

8

On April 22, 2009, Mason A. Ahearn, M.D., an orthopedist, performed a consultative physical examination. The plaintiff reported that she most recently worked at a pharmacy clinic until March 2004, when she was laid off because the company closed. After the plaintiff was laid off, she drew unemployment benefits, and she had been looking for work in the same field ever since. The plaintiff felt that she could return to her duties as a pharmacy tech if she were offered a job similar to her previous job. The plaintiff reported that she lived in a mobile home with her ten year old son. She was able to perform activities of daily living including cooking, cleaning, doing laundry, vacuuming, and light picking up in the yard. She was able to push a cart at Wal-Mart and the grocery store, and she drove a car without a handicapped sticker. She attended church once a month, visited with her mother and sisters, watched television after doing her household chores, and did some limited computer activity. Dr. Ahearn reported that the plaintiff walked without any assistive devices with a normal gait and stance. She got on and off the examination table in a coordinated manner, and she was able to walk on her heels and toes, tandem walk, and do half a squat (limited by knee pain). Her cervical motion was full, but she had a sense of crepitation on flexion, extension, and rotation. The plaintiff had full range of motion of all joints in her upper extremities with the exception of her thumb tips, and she had completely intact range of motion in her lower extremities. She had good gross mechanical dexterity and good fine manual dexterity. The plaintiff was able to open a freezer bag, take out a pill bottle, open the bottle, and take out the pill in a good bimanual manner. She had no muscular, sensory, or reflex changes in her upper or lower extremities; full lumbar motion;

and straight leg raising to 90 degrees sitting, and 60 degrees supine. She had tenderness to palpation of the paralumbar muscular areas with slight spasm, and patellofemoral crepitation on flexion and extension of the knees. X-rays of the plaintiff's cervical spine revealed cervical changes and evidence of prior fusion surgery, and x-rays of her hands showed slight joint space narrowing of both the PIP and DIP joints and multiple degenerative changes of both CM joints. Wrist films demonstrated no carpal abnormalities (Tr. 360-62).

Dr. Ahearn noted that the plaintiff had high blood pressure and GERD. She was only able to do half a squat due to bilateral knee pain. Dr. Ahearn opined that the plaintiff would be unable to do any work involving standing for long periods or heavy labor. He opined that the plaintiff could stand for no more than 15-20 minutes at a time; perform no bending, stooping, crawling, kneeling, negotiating ladders/ catwalks, or climbing of multiple flights of stairs; and do no repetitive lifting and no single lifting of more than 30 pounds. Dr. Mason further opined that the plaintiff could not sit at a data station eight hours per day entering data, and could not perform rapid assembly line repetitive use of her hands. Dr. Ahearn felt that the plaintiff would be able to do her chosen occupation of pharmacy technician with those restrictions (Tr. 362).

On September 8, 2009, Dr. Twining noted the plaintiff's arthralgias, rheumatoid arthritis, and morning stiffness. The lumbar spine x-rays showed mild spurring at multiple levels. A cervical spine x-ray showed moderate neuroforaminal encroachment

on the left at C5-6 and C6-7 and on the right at C6-7 and C7-T1.  She was referred to pain management (Tr. 529-31).

On September 14, 2009, Dr. Twining wrote that an MRI of the plaintiff's cervical spine showed a mild broad-based bulge at C3-4 with deformity of the right lateral thecal sac and narrowing of the right neuroforamen, a mild broad-based bulge at C4-5, and a hard disc bulge at C5-6, flattening of the thecal sac and cervical cord with a narrowing of the neural foramen bilaterally.   The plaintiff was referred to pain management.   On November 3, 2009, the plaintiff had a positive straight leg raise test on the left (Tr. 534-35).

On September 22, 2009, Paul David Bunn, M.D., at Myrtle Beach Endocrinology, saw the plaintiff and performed a thyroid ultrasound and biopsy.  On October 26, 2009, Dr. Bunn diagnosed the plaintiff with goiter and prescribed Synthroid (Tr. 402).

On November 6, 2009, the plaintiff reported to the Pain Center for numbness and weakness in her right arm over the previous six months.  She was seen by Patricia R. Grant, M.D., a pain management specialist.  Dr. Grant reported that the plaintiff had mild grip weakness on the right and was generally deconditioned.  Dr. Grant diagnosed cervical radiculitis, regional myofascial pain, cervical spondylosis, and history of cervical fusion.  She prescribed a series of lumbar epidural steroid injections and advised the plaintiff to start doing stretching and strengthening exercises in her neck and shoulders.   Imaging from September 14, 2009, showed an interbody fusion at C6-7, moderate broad-based disc bulge, osteophyte at C5-6 causing some flattening of the anterior thecal sac and cervical cord that was associated with bilateral neuroforaminal stenosis.   There was an anterior

extradural defect at the C3-4 level.  The plaintiff had very, very poor posture, contracted pectoral muscles, rounded shoulders, and a protracted cervical spine.  She was scheduled for cervical epidural steroid injections, which were performed on November 9 and December 18, 2009 (Tr. 368-73).

On December 18, 2009, the plaintiff reported that after undergoing an initial cervical epidural steroid injection she was feeling better overall.  She no longer had tingling in the side of her neck, although she still had some pain.  Dr. Grant reported that she had "no new neurological deficits or radiation down her arms" (Tr. 373).

On January 5, 2010, the plaintiff had pain in her left knee and right foot.  She had a positive straight leg raise test on the left (Tr. 538).

On March 17, 2010, the plaintiff saw Alex Duvall, M.D., a family doctor, for a followup appointment (Tr. 379).  The plaintiff denied any recent health problems (*id*.).  On March 30, 2010, the plaintiff had fullness of her left MCP joints (Tr. 542).

On May 6, 2010, Paul D. Bunn, M.D., an endocrinologist, saw the plaintiff for a followup appointment regarding a diagnosis of goiter with nodules.  The plaintiff was taking Methotrexate for rheumatoid arthritis and Synthroid for her thyroid problems.  A physical examination was essentially unremarkable.  A thyroid ultrasound showed reduction in the size of the nodule on the left lobe of the plaintiff's thyroid gland, and no changes on the right lobe (Tr. 400-401).

On June 22, 2010, Dr. Twining wrote that the plaintiff was on an increased dosage of Methotrexate due to increased activity of her rheumatoid arthritis.  The increased

dosage somewhat helped her hands, but she still had significant pain and swelling in her feet (Tr. 545-48). On September 20, 2010, the plaintiff had pain and swelling in her feet. Her grip strength was not what it should be. The Methotrexate was making her nauseous, and she was switched to an injection of the medication (Tr. 556).

On November 4, 2010, the plaintiff told Dr. Bunn that she had been switched from oral to injectable Methotrexate and was doing "much better" in terms of her prior side effects of gastrointestinal distress (Tr. 407).

On November 12, 2010, the plaintiff sought treatment from Dr. Twining for complaints of right wrist pain (Tr. 424). The plaintiff had bilateral synovitis bilaterally, with pain in her thumb. She also had pain in her left knee and shoulders (Tr. 424-27). Dr. Twining felt that the plaintiff's symptoms were caused by rheumatoid arthritis (Tr. 426).

On December 14, 2010, Mary Lang, M.D., a state agency physician, reviewed the plaintiff's medical records and opined that she was capable of doing light work that required no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling; and no more than frequent balancing. The plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. She could stand, walk, and sit about six hours in an eight-hour workday. She was limited to frequent push/pull hand controls and foot controls bilaterally. (Tr. 416). Dr. Lang opined that the plaintiff was limited to no more than occasional reaching in all directions, including overhead (due to neck pain), and no more than frequent handling and fingering with her right upper extremity (Tr. 417). Environmentally, Dr. Lang opined that

the plaintiff should avoid even moderate exposure to extreme cold and wetness, due to her rheumatoid arthritis (Tr. 418).

On January 17, 2011, the plaintiff saw Dr. Twining for a followup appointment (Tr. 428). Examination of the plaintiff's hands revealed improving bilateral synovitis (Tr. 429). Her cervical range of motion was normal, and examination of her back revealed no abnormalities (Tr. 429). Dr. Twining prescribed Ultram and folic acid (Tr. 431).

On March 21, 2011, the plaintiff reported pain in her left knee and both shoulders. Both ankles exhibited some swelling and synovitis and were painful with range of motion. She had significant iron deficiency (Tr. 469-72).

On May 18, 2011, the plaintiff saw Dr. Bunn for a followup appointment (Tr. 476). The plaintiff told Dr. Bunn that she thought she had fibromyalgia, but Dr. Bunn explained to her that she had only eight out of 18 trigger points for the condition, which was "not really diagnostic" (Tr. 479). The plaintiff had pain in her left knee and shoulder. She had swelling in both ankles. The plaintiff described poor sleep, fatigue, and chronic pain. Dr. Bunn prescribed Neurontin for the plaintiff's complaints of chronic pain, poor sleep, and fatigue (Tr. 480).

On June 9, 2011, Cleve Hutson, M.D., a state agency physician, reviewed the plaintiff's medical records and concurred with Dr. Lang's December 14, 2010, assessment (Tr. 444-49).

On August 15, 2011, the plaintiff's hands demonstrated improving synovitis, but her grip strength was poor and she had synovitis in one foot. She had pain in her left

knee. She could not tolerate the Methotrexate and was switched to Enbrel injections. Neurontin was continued at 300mg (Tr. 487-91).

On October 14, 2011, Dr. Twining completed a Medical Source Statement regarding the plaintiff's inflammatory arthritis. The plaintiff had a history of joint pain, joint swelling, joint tenderness, morning stiffness, synovial inflammation, limitation of motion in joints, radiographic changes typical of inflammatory arthritis, an inability to ambulate effectively, and an inability to perform fine and gross movements effectively. The plaintiff had inflammation in her hands, wrists, and ankles bilaterally. She had severe fatigue and malaise. Dr. Twining opined that the plaintiff suffered from marked limitations of activities of daily living, moderate limitations of social functioning, and marked limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace (Tr. 455). He opined that the plaintiff could stand for 15 to 30 minutes at one time; sit for 30 minutes at one time; work one hour per day; lift ten pounds occasionally and five pounds frequently; occasionally bend; never stoop; occasionally raise her arms overhead; occasionally perform gross manipulations with her bilateral hands; and never perform fine manipulations with her bilateral hands (Tr. 454-56). Dr. Twining further opined that the plaintiff was unable to ambulate effectively or perform fine and gross movements effectively (Tr. 456). He opined that the plaintiff was disabled due to rheumatoid arthritis (Tr. 457).

On February 7, 2012, the plaintiff saw Dr. Twining for a recheck of her rheumatoid arthritis. The plaintiff reported that she was doing "fine today." On physical examination, the plaintiff had mild osteoarthritis in her bilateral thumbs with no synovitis and

15

good grip strength. Examination of her knees, shoulders, elbows, and back were normal, and a straight leg raising test was negative. A tender point examination for fibromyalgia was negative, which Dr. Twining noted to be an improvement from her previous exam. A neurologic examination revealed that the plaintiff was alert and well oriented with no impairment of her recent or remote memory and normal coordination. Dr. Twining prescribed Ultram. Dr. Twining noted that it was necessary to get Enbrel authorized because the plaintiff had increased stiffness and pain (Tr. 496-98).

On April 23, 2012, the plaintiff told Dr. Twining that she was doing well and that her condition had improved, with less stiffness and pain, since she began receiving injections of Enbrel (a medication used to treat rheumatoid arthritis). She had osteoarthritis deformity and pain in the joints of the thumb. Dr. Twining's impression was that overall the plaintiff's symptoms were under good control, and her grip strength was improved (Tr. 502-504).

On June 28, 2012, the plaintiff had symptoms of rheumatoid arthritis in her intraphalangeal joints, metacarpal phalangeal joints, wrist, elbow, shoulder, neck, back, hip, knee, ankle, and foot. She experienced fatigue. She had pain and deformity in her thumbs that was consistent with osteoarthritis. She had swelling of her ankle with pitting edema bilaterally. She was prescribed Augmentin in place of Enbrel (Tr. 506-09).

On September 28, 2012, Dr. Twining wrote that the plaintiff had been under his long-term care for rheumatoid arthritis, carpal tunnel syndrome, severe iron deficiency anemia, and fibromyalgia. She suffered from significant, chronic pain, fatigue (due to

anemia and medications) and severe stiffness/swelling (as a result of her arthritis).  It was his medical opinion that the plaintiff was disabled (Tr. 786).

On October 4, 2012, the plaintiff underwent audiological testing, which showed evidence of mild to moderately severe hearing loss ranging from 40 to 60 decibels (Tr. 787).

On October 8, 2012, Dr. Duvall wrote a letter in which he opined that plaintiff's arthritis would preclude any rigorous activity, prolonged walking, or standing.  Dr. Duvall wrote that the plaintiff had a history of hypertension, esophageal reflux disease, rheumatoid arthritis, hypothyroidism, and cervical disc disease.  She also had degenerative arthritis of her knees and was currently being referred for possible joint replacement (Tr. 788).

During the hearing held on June 23, 2015, the plaintiff testified that she had carpal tunnel syndrome and had trouble carrying anything heavy since 2006.  She had carpal tunnel surgery in 2001.  She was 5'0" and weighed 208 pounds.  She had lost all hearing in her left ear and partial hearing in her right ear.  She could not hear people in front of her or behind her, and she had trouble listening on the phone.  She had those problems since 2005 (Tr. 616).

The plaintiff reported that her ankles were swollen.  She had problems with her knees, and her feet hurt from standing and walking.  During the day, she would lie down for an hour on the couch with her foot and her hand propped up.  Her legs were slightly higher than her head when she was trying to reduce the swelling.  She had been elevating her legs since 2006.  She could walk half a block before she would need to take a rest because her legs and feet started to hurt (Tr. 617).

The plaintiff testified that she last worked at Neighbor Care. She worked for 15 years in the pharmacy and four years in medical records. In the medical records department, she had to carry cases from printers into the building. As a pharmacy technician, she packaged medicines for nursing homes. She lifted paper to refill the machines and lifted 25 pounds on a daily basis. She pushed and did some bending also. She stooped, crawled, walked, sat, and stood in that job. She had problems in her hands and fingers due to rheumatoid arthritis, carpal tunnel syndrome, and bulging discs in her neck. She had neck problems since 2001, and she had rheumatoid arthritis since 2006. She was diagnosed with fibromyalgia by her rheumatologist in 2007. The plaintiff had difficulty going up and down stairs. She had to use arm rails because her legs and ankles hurt going up and down the steps. She could not drive long distances, but drove a mile to her mom's house or a mile to the store. She could not drive farther because her ankle and leg started hurting, and she became tired very quickly. This had been the case since 2006 (Tr. 618-20).

The plaintiff testified that she tried to do what she could around the house, but she had to take 30-minute or hour breaks to relax after she did certain jobs. She would need to lie down and relax her feet, hands, and legs. She had three bad days a week since 2006. On a bad day, the plaintiff would lie down in her bed and prop up her legs and hand. She had pain in her feet, legs, and ankles. She also had a headache when her neck cracked. She did not sleep well at night. She had problems with her left knee. It hurt to bend it and to walk on it. She had knee problems since 2006. The plaintiff's understanding

of her medical condition was that she had rheumatoid arthritis, carpal tunnel syndrome, a bulging disc and a ruptured disc in her neck, fibromyalgia, and loss of hearing. She felt her conditions worsened since September of 2009. She took ten medications a day. Side effects included nausea and stomach cramps that lasted about an hour. She took her medications at 8:00 a.m. and 9:00 p.m. It took her 90 minutes to get ready to go to a doctor's appointment. When she was working she needed 30 minutes to get ready for work. It took her longer now because she was still tired, and she did not have the energy to get ready fast. Sometimes she napped for an hour during the day. The plaintiff stated that she elevated her legs five days a week, for six hours a day (Tr. 622-25).

The plaintiff reported that she stopped working in 2004 because she was laid off when the company that she worked for as a pharmacy technician closed. Then she was diagnosed with rheumatoid arthritis (Tr. 192, 360). After the plaintiff was laid off, she collected unemployment benefits and looked for another job as a pharmacy technician (Tr. 360).

During the 2015 administrative hearing, the ALJ asked the vocational expert to assume a hypothetical individual with the plaintiff's vocational characteristics who was limited to light work with a sit/stand option who could stand, walk, and sit for six hours each in an eight-hour work day; never climb, crawl, kneel, or tolerate exposure to loud noise; occasionally finger bilaterally and perform overhead reaching bilaterally; and frequently handle bilaterally (Tr. 625-26). The vocational expert testified that the proposed limitations would preclude the performance of all of the plaintiff's past relevant work, but the

hypothetical individual would be able to perform a representative sample of light jobs including investigator of accounts (272,000 jobs in national economy, 1,500 jobs locally), ticket stamper (1.8 million job in national economy, 2,100 jobs locally), and checker (83,000 jobs in national economy, 1,300 jobs locally) (Tr. 626).

The vocational expert testified that an individual who missed work one day a week would not be able to maintain full-time employment. An individual who needed unscheduled breaks of one-hour per day to elevate her legs would also not be able to maintain full-time employment. If the individual were unable to hear people behind her and had, in addition, difficulty hearing instructions from supervisors and co-workers, it would be considered a safety issue, and the individual would have difficulty maintaining full-time employment (Tr. 627-28).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) improperly relying on the vocational expert testimony to deny her case; (2) failing to consider the erosion of the occupational base for light work; (3) failing to comply with the Appeals Council's remand order; and (4) failing to properly assess the medical opinion evidence (doc. 18 at 17-34).

The plaintiff first argues that the ALJ improperly relied on the vocational expert testimony to find that she could perform work that exists in significant numbers in the national economy (doc. 18 at 17-20). Specifically, in the residual functional capacity ("RFC") assessment, the ALJ found that the plaintiff was only capable of performing occasional fingering and frequent handling bilaterally (Tr. 597). In response to the hypothetical

provided by the ALJ, the vocational expert testified that such an individual would be able to perform the requirements of representative occupations such as investigator of accounts, ticket stamper, and checker (Tr. 626). The vocational expert further testified that her testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 626-27). The ALJ relied on this testimony at step five of the sequential evaluation process to find the plaintiff not disabled (Tr. 604). However, the *DOT* provides that two of the jobs that the vocational expert identified and the ALJ relied on – ticket stamper and checker – require frequent to constant fingering and handling. *See* Ticketer, DICOT 229.587-018, 1991 WL 672150 (constant fingering and handling); Checker I, DICOT 222.687-010, 1991 WL 672130 (frequent fingering and handling). Thus, the plaintiff argues that because the ALJ failed to identify the apparent conflict between the vocational expert's testimony and the *DOT*'s description of these jobs, obtain a reasonable explanation for the conflict, resolve the conflict, and explain such resolution in the decision, substantial evidence does not support the ALJ's determination that she can perform the jobs.

> Social Security Ruling ("SSR") 00-4p provides in pertinent part:
>
> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the *DOT*. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the *DOT*; and

> If the VE's . . . evidence appears to conflict with the *DOT*, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the *DOT*, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

2000 WL 1898704, at *4. In *Pearson v. Colvin*, 810 F.3d 204, 209-10 (4th Cir. 2015), the Fourth Circuit Court of Appeals held that a vocational expert's testimony that apparently conflicts with the *DOT* can only provide substantial evidence if the ALJ has received an explanation from the expert and determined that the explanation is reasonable and provides a basis for relying on the testimony rather than the *DOT*.

In response, the Commissioner concedes that the ALJ's investigation of the conflict between the *DOT* and the vocational expert's testimony with regard to the jobs of ticket stamper and checker falls short of the requirements of *Pearson* (doc. 19 at 12). However, the Commissioner notes that there is no conflict between the vocational expert's testimony and the *DOT* with respect to the third job that the vocational expert identified, investigator of accounts, which requires only occasional handling and fingering. *See* Investigator of Accounts, DICOT 241.367-038, 1991 WL 672258. According to the vocational expert's testimony, some 272,000 such jobs exist in the national economy (Tr.

604, 626). Thus, the Commissioner argues that substantial evidence still supports the step five finding that the plaintiff is not disabled (doc. 19 at 12).

However, as the plaintiff notes, the *DOT* provides that the investigator of accounts job, unlike the ticket checker and stamper jobs, requires frequent hearing. *See* Investigator of Accounts, DICOT 241.367-038, 1991 WL 672258; Ticketer, DICOT 229.587-018, 1991 WL 672150; Checker I, DICOT 222.687-010, 1991 WL 672130. At step two of the sequential evaluation process, the ALJ found that the plaintiff's hearing loss was a severe impairment, noting that "an October 2012 audiology examination showed evidence of hearing loss" (Tr. 595 (citing Tr. 787)). In the RFC finding, however, the only limitation included by the ALJ with regard to the plaintiff's hearing loss was a limitation to "never . . . tolerate exposure to loud noise" (Tr. 596-97). In so doing, the ALJ again acknowledged the October 2012 audiology examination that "showed evidence of mild hearing loss to moderately severe hearing loss ranging from 40 to 60 decibels," but the ALJ noted that the examination "does not show a complete lack of hearing in one ear, as the claimant testified at the hearing" and that there was "no evidence that the claimant ever showed significant difficulty hearing at a routine examination" or "that the claimant was ever prescribed or obtained hearing aids" (Tr. 599-600). Accordingly, the ALJ found that the evidence was "not consistent with the claimant's allegations of severe hearing deficits" (Tr. 600).

The petitioner argues, "Given the ALJ's reference to mild to moderately severe hearing loss, as well as the evidence documenting frequent episodes of otitis media that affected her hearing, it is unclear how [she] could perform a job that required frequent

hearing" (doc. 18 at 19). The undersigned agrees. The evidence in the record with regard to the plaintiff's hearing impairment includes the following: In September 2005, Dr. Fry noted the plaintiff had bilateral middle ear effusion with conductive hearing loss (Tr. 293). In October 2007, the plaintiff reported left ear pain, and Dr. Duvall noted that she had previous infections and "had pretty much lost all of her hearing in the ear from infections" (Tr. 349). In July 2008, Dr. Duvall indicated that the plaintiff had problems with recurrent otitis media (ear infection) with some decreased hearing and a speech impediment (Tr. 352). The October 2012 audiology examination referenced by the ALJ showed that the plaintiff had mild to moderately-severe hearing loss bilaterally (Tr. 787). At the 2012 administrative hearing, the plaintiff testified that she had a hearing aid in her right ear, but she could not wear her left hearing aid because she had an ear infection, and her ear was always swollen. The plaintiff said that she could not hear people standing behind her, if there were a lot of people, or if someone whispered (Tr. 47-49). At the 2015 hearing, she testified that she had "lost all [her] hearing in [her] left ear and partial in [the] right ear" (Tr. 616). Further, in response to a question by the plaintiff's attorney, the vocational expert testified that if the individual in the ALJ's hypothetical was unable to hear people behind her and had difficulty hearing instructions from supervisors and co-workers even if they were face-to-face, it would impact the identified jobs as it "would be considered as a safety issue. It would not be permitted. The individual would have difficulty maintaining full-time employment" (Tr. 628).

The Commissioner argues in response that "the ALJ did not find that Plaintiff could perform 'frequent hearing.' Rather, he accounted for Plaintiff's hearing loss by limiting her to jobs that did not require any exposure to loud noise" (Tr. 19 at 14). The Commissioner's point is well taken, but it begs the question of whether the ALJ's limitation in the RFC assessment to jobs that do not require any exposure to loud noise adequately accounted for the plaintiff's hearing impairment in view of the foregoing evidence. Without further discussion and evaluation by the ALJ, the undersigned is unable to determine whether the ALJ's decision is based upon substantial evidence. As the only job supporting the ALJ's step five finding is one that requires frequent hearing, the undersigned recommends that this case be remanded to the ALJ for further consideration of the plaintiff's hearing impairment in the RFC assessment and for the purpose of obtaining vocational expert testimony as to any conflict between the requirements of the jobs identified by the vocational expert and the limitations imposed by the ALJ in the RFC in light of all the evidence and the applicable law.

With respect to the plaintiff's remaining allegations of error, on remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration of this claim. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). *See also Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). Accordingly, as part of the overall reconsideration of this claim upon remand,

the ALJ should also consider and address the additional allegations of error raised by the plaintiff.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

September 18, 2017
Greenville, South Carolina